UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| GREATER ST. LOUIS CONSTRUCTION LABORERS WELFARE FUND, ET AL., <br><br> Plaintiffs, <br><br> vs. <br><br> ROADSAFE TRAFFIC SYSTEMS, INC., <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

Case No. 4:20-CV-1201 PLC

## MEMORANDUM AND ORDER

Plaintiffs – four employee benefit plans, their trustees, and the union affiliated with those benefit plans – filed this action to recover from Defendant Roadsafe Traffic Systems, Inc. delinquent contributions, liquidated damages, attorney fees, and costs pursuant to the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1132 and 1145, and the Labor Management Relations Act of 1947 (LMRA), 29 U.S.C. § 185. Plaintiffs move for summary judgment on their claim for $128,709.46 in unpaid contributions and supplemental dues and associated penalties, costs, and interest. [ECF No. 25] Defendant also moves for summary judgment, arguing that Plaintiffs base their claims for delinquent contributions on a formula that is not supported by either the plain language of the CBA or Plaintiff's "own extrinsic evidence." [ECF No. 27] For the reasons stated below, the Court denies Plaintiffs' motion and grants Defendant's motion.

    **I.**    **Background**

Plaintiffs are four employee benefits plans (the Welfare, Pension, Vacation, and Training

1

Funds) and their boards of trustees (collectively, "the Funds"), Local Union Nos. 42-110, Laborers International Union of North America, and AFL-CIO. Defendant entered a collective bargaining agreement (CBA) with Local Union Nos. 42, 53, and 110, effective March 2014 through March 2019.  [ECF Nos. 26-4, 29-1]  Plaintiffs commissioned an audit of Defendant's payroll records from the period of January 1, 2014 through December 31, 2016, which, they allege, reflects that they are entitled to $128,561.19 from Defendant, representing delinquent contributions, supplemental dues, liquidated damages, interest, accounting fees, legal fees, and court costs. [ECF No. 1]

A. Language of the CBA

Under Article II of the CBA, entitled "Area Limits," Section 2.01 provided:  "This Agreement shall apply only to work of the Employer on construction sites located in the City of St. Louis, or the Counties of St. Louis, Jefferson, or Washington, Missouri[.]"  [ECF Nos. 26-4, 29-1]   Section 5.01 of the CBA defined two categories of covered work – namely, "Building Construction" and "Highway/Heavy" – and set forth Defendant's hourly wages, fringe benefit contributions, and supplemental dues obligations for "all employment of all employees in the unit, when employees are engaged in the general activities in conjunction with Building Construction and Highway/Heavy…."[1]  [Id.]

---

[1] Other CBA provisions specifically referred to Defendant's obligations with respect to wages and fringe benefit contributions for work performed on construction sites.  For example, the CBA provided that "when subcontracting on site construction work requiring laborers at jobsites covered by this Agreement," Defendant "will obtain the written agreement of the subcontractor" to "pay to or provide for employees performing such subcontracted work on jobsites wages and fringe benefits in an aggregate dollar cost no less than the aggregate dollar cost of wages and fringe benefits" Defendant is required by pay under the CBA.  [Id. at § 1.06]  In regard to apprentices, the CBA stated that apprentices "shall not be entitled to payment of wages, nor shall [Defendant] be responsible for payment of fringe benefit contributions, for time spent in off-the-job related instruction or training[.]"  [Id. at § 5.02]

Referring back to the wage schedules in Section 5.01, the CBA provisions governing contributions to the Welfare, Pension, and Training Funds, required Defendant to "contribute (specific amounts will be noted on wage schedules) per hour for each actual hour worked by employees covered by this Agreement…." [Id. §§ 5.03, 5.04, 5.06]  In regard to the Vacation Fund, the CBA provided that Defendant will "deduct one dollar ($1.00) for each hour worked from the basic wage rate and pay the same to the" Vacation Fund. [Id. at § 5.05]  The CBA also required Defendant to submit monthly contribution report forms and authorized the Funds to examine payroll and related records to ensure compliance with the CBA's contribution requirements. [Id. at § 5.10]  In the event Defendant "is delinquent in payment of any Fringe Benefit contributions," Defendant was obligated to pay liquidated damages of twenty percent on delinquent contributions, in addition to attorney fees, court costs, and payroll examination fees. [Id. at §§ 5.10, 5.11]

B.  Payroll Examination

The Funds hired RSM US LLP, an independent accounting firm, to examine Defendant's payroll and related records for the period of January 1, 2014 through December 31, 2016. [ECF Nos. 26-1 at ¶ 9, 26-2, 26-6]  Auditor John Massa provided Defendant a preliminary payroll examination report on August 1, 2017 ("Preliminary Examination Report"). [ECF No. 29-2]  The cover letter of the preliminary report stated: "**Our preliminary findings show a total of $5,974.50[2] under reported hours, and $3,914.24 in under paid Supplemental Dues**." [ECF No. 29-3 (emphasis in original)]  The letter further advised:

> In arriving at our final report, it is important that we are in contact with you or an agent of your company who has the authority to discuss and resolve any questions regarding our preliminary findings.  If you have any additional information to modify our initial findings, please contact Mr. John Massa within

---

[2] In their memorandum in opposition to Defendant's motion for summary judgment Plaintiffs state that the dollar sign before the total number of under-reported hours was a "an obvious and easily recognizable typo on the face of the document." [ECF No. 33 at 9]

3

> <u>14 days from the date of this letter.</u>  If no additional information is provided, a final report will be issued based on the information received.

[Id. (emphasis in original)]

The summary page of the Preliminary Examination Report reflected the auditor's finding that Defendant failed to report 5,974.50 hours worked and failed to pay $3,914.24 in supplemental dues.  The summary also contained the following footnote 2, relating to the unreported hours:

> The employer does not report "shop" hours where the job duties performed include non-job[-]related shop work, traveling, filling out paperwork, and loading/unloading not related to a Prevailing Wage job.  These hours are noted as "NON" under the "Craft" and "Class" columns of the earnings records provided.  However, based on a review of the Collective Bargaining Agreement (CBA), and a conversation with the Funds' attorney, all loading and unloading is work covered under the CBA and, therefore, reportable.  Therefore, because the loading and unloading work could not be distinguished from other job duties within the "NON" category of hours, and because the Funds do not recognize "Non-Reportable" hours under the Split-Time Doctrine, all "NON" hours are included in the "Reportable Hours' column above….

[Id.]

In response to the Preliminary Examination Report, Defendant's payroll manager Julie Kozak requested "the Union's policy Re:  Loading and Unloading," and, on August 24, 2017, Mr. Massa provided her a letter from Eastern Missouri Laborers' District Council to its signatory contractors dated August 2008.[3]   [ECF No. 29-5]   Five days later, Defendant's payroll

---

[3] The August 2008 letter provided that "[s]howing up at a contractor's yard to load or unload material constitutes covered work and the employee's time starts immediately at the rate so specified in the contract."  [ECF No. 29-5]  Additionally, "[o]nce the employee's time has started, any subsequent truck time during the work day (i.e. picking up material or fuel, traveling to another site, etc.) is considered covered work and paid at the contract rate so specified."  [Id.]  However, "[w]orking in the yard, except for the loading and unloading of trucks, before leaving the yard for a jobsite, or arriving at the yard from a jobsite, is not considered to be covered work."  [Id.]

4

administrator Leanne Hardy informed Mr. Massa that Defendant did "not agree that SHOP[4] time away from the jobsite is included in the [CBA]," and referred Mr. Massa to Section 2.01 of the CBA, which states that the Agreement applies "only to work of the Employer on construction sites." [ECF No. 29-6]  Ms. Hardy asserted that Defendant paid contributions and supplemental dues as required by Section 2.01 of the CBA, and she asked Mr. Massa to "adjust the SHOP time out of the calculation and resubmit your findings[.]"  [Id.]

On August 30, 2017, Mr. Massa responded to Ms. Hardy's email, acknowledging that "'Shop' time that is not related to Loading & Unloading may not be reportable" and requesting documentation "that distinguishes the 'Non-Reportable' Loading/Unloading 'Shop Time' from other "Shop Time' duties[.]"  [ECF No. 29-6]  Ms. Hardy replied to Mr. Massa the same day, reiterating Defendant's position that the CBA applies only to work performed on construction sites and stating that Defendant paid employees "to load/unload for all prevailing wage projects," but not for time "spent in the shop doing non-job related shop work, travelling, or filling out paperwork," because those activities were not performed on a construction site.  [ECF No. 29-7]  In regard to the requested documentation, Ms. Hardy stated:  "The only documentation I could think to reference are the time cards we provided previously," which listed employee activities "and if they were to be paid prevailing wage."  [Id.]

On August 31, 2017, Mr. Massa emailed Ms. Hardy, seeking additional clarification as to the types of work Defendant coded as "NON" on its timecards and Defendant's reporting practices for loading and unloading hours for prevailing wage jobs.[5]  [ECF No. 29-9]  Defendant did not

---

[4] In her subsequent email, Ms. Hardy clarified that she "should have denoted NON hours instead of SHOP hours in my previous email.  When entering payroll, they are synonymous to me." [ECF No. 29-8]

[5] Mr. Massa's email presented the following questions:
   1) RE:  Prevailing Wage Jobs – Did you report (to the St. Louis Funds) Loading/Unloading

respond to Mr. Massa's email.

Approximately three years later, on July 10, 2020, counsel for the Funds sent Defendant a letter demanding $90,997.61 in contributions, $5,334.19 in supplemental dues, $18,495.40 in liquidated damages, and $13,753.98, for a total of $128,561.19.  [ECF No. 29-10]  Counsel for the Funds followed up with a similar letter on August 13, 2020.  [ECF No. 29-11]

Plaintiffs filed their complaint on September 4, 2020, seeking $128,561.18 in unpaid contributions, liquidated damages, and interest, plus "reasonable attorneys' fees, accounting fees, and legal costs[.]"  [ECF No. 1]  Later that month, RSM completed a another "Payroll Compliance Examination Consulting Services Report" ("Final Examination Report"), which contained the same calculations as the  Preliminary Examination Report of 2017.  [ECF No. 29-12]

At Plaintiffs' counsel's request, RSM revised the audit calculations in February 2021 in accordance with the "split-time policy for the traffic control sector," and provided Defendant a revised Payroll Compliance Examination Consulting Services in July 2021 ("Revised Final Report").[6]  [Nos. 29-15, 29-16]  The Revised Final Report contained the same footnote 2 as the Preliminary Examination Report, and added footnote A, which stated: "By direction of the Funds' attorney, all 'NON' hours, and their associated wages, where these hours were the only hours

---

for hours on the job site only, or Loading/Unloading hours for both job Site & Yard?
2) Are there any Prevailing Wage Loading/Unloading hours coded as "NON"?
3) Did you report (to the St. Louis Funds) Loading/Unloading hours for Non-Prevailing Wage Jobs whether on Site, or at the Yard?
4) Is there any way to distinguish Loading/Unloading hours on the Time Journals provided?
[ECF No. 29-9]

[6] As Plaintiffs' counsel explained in an email to Defendant's counsel, the Revised Final Report "removed every entry where it appeared that an employee's only hours for a given day were in the show" and considered "shop time hours … covered only when the employee performs shop work on a day where that employee also performed other covered (non-shop) work.," resulting in "a reduction of about $30k overall."  [ECF No. 29-15]  The Revised Final Report reflected a total of 4,674.00 unreported hours and $3,092.99 in under paid supplemental dues.  [ECF No. 29-16 at 29]

worked that day, were removed from the report (1,300.75 total hours and $821.27 in Supplemental Dues)."[7]  [ECF No. 29-16 at 30]  According to the Revised Final Report, the total amount Defendant owed Plaintiffs was $105,654.96.  [Id. at 31]

## II.   Legal Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Hill v. Walker, 737 F.3d 1209, 1216 (8th Cir. 2013).  The movant "bears the initial responsibility of informing the district court of the basis for its motion" and must identify "those portions of [the record]...which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the movant does so, the non-movant must respond by submitting evidentiary materials that set out "specific facts showing that there is a genuine issue for trial." Id. at 324 (quotation marks omitted).

"On a motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts.'" Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (quoting Scott v. Harris, 550 U.S. 372, 380 (2007)).  The court's function is not to weigh the evidence but to determine whether there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting

---

[7] Like the previous iterations of the examination report, the Revised Final Report was organized by employee and, for each bimonthly pay period, lists the number of:  (1) "reportable hours," "hours reported," and "difference over(under) reported" for fringe benefits; and (2) "reportable wages," "dues owed," "dues paid," and "difference (over)under paid" for supplemental dues.  [Id. at 3-37]  The report then totals those figures to calculate the number of hours for which Defendant allegedly failed to make contributions and the amount owed in supplemental dues.  [Id. at 29]  The report does not reflect the project, tasks, or site on which an employee worked.

7

Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)).

## III. Discussion

Plaintiffs move for summary judgment on their claim for delinquent contributions and supplemental dues, liquidated damages, interest, audit costs, and legal costs totaling $128,561.19.[8] [ECF Nos. 25 & 26]  Defendant moves for summary judgment on Plaintiffs' claims, arguing that the audit on which Plaintiffs rely was flawed because RSM erroneously assumed that the CBA required Defendant to pay contributions and supplemental dues for hours worked on and off construction sites.  [ECF Nos. 27 & 28]   Defendant argues that it "complied with the plain language of the parties' CBA and it owes no additional contributions to the Funds."  [ECF No. 28 at 3]  Defendant further asserts that "given the Funds' dilatory and egregious conduct in this case, the Funds are not entitled to recover any additional contributions under the equitable doctrines of estoppel and unclean hands." [Id.]

ERISA "is a comprehensive statute that sets certain uniform standards and requirements for employee benefit plans."  Minn. Chapter of Associated Builders & Contractors, Inc. v. Minn. Dept. of Pub. Safety, 267 F.3d 807, 810 (8th Cir. 2011) (quotations omitted).  Section 515 of ERISA, which governs claims of non-payment with respect to fund contributions, provides:

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

29 U.S.C. § 1145.  The purpose of the statute is "to simplify actions for delinquent contributions, avoid costly litigation, and facilitate the administration of multi-employer plans."  Reed v.

---

[8] In their memorandum in opposition to Defendant's motion for summary judgment, Plaintiffs cite the Revised Final Report and state that "the total amount [Defendant] owes the Funds is $105,654.96." [ECF No. 33 at 2]

8

Insituform Techs., Inc., 994 F.Supp.2d 1022, 1026 (D. Minn. 2014); see also Neese as Trustees of Minn. Laborers Health & Welfare Fund, 7 F.4th 769, 776 (8th Cir. 2021).

"Under ERISA § 515, [multiemployer fringe benefit funds] may collect only those contributions that [an employer] is contractually obligated to pay." Carpenters Fringe Benefit Funds of Ill. v. McKenzie Eng'g, 217 F.3d 578, 582 (8th Cir. 2000). "Ordinary contract law governs the interpretation of CBAs, and if a CBA is unambiguous, the parties will be bound by its terms." Iron Workers St. Louis Dist. Council Annuity Tr. v. United Ironworkers, Inc., No. 4:15-CV-713 AGF, 2016 WL 4701588, at *6 (E.D. Mo. Sep. 8, 2016) (citing Cent. States Se. & Sw. Areas Pension Fund v. Indep. Fruit & Produce Co., 919 F.2d 1343, 1348 (8th Cir. 1990)). "Where the words of a contract in writing are clear and unambiguous, its meaning is to be ascertained in accordance with its plainly expressed intent." Serv. Emps. Int'l Union Loc. 2000 Health & Welfare Fund v. Agency for Cmty. Transit, Inc., No. 4:16-CV-1065 CDP, 2018 WL 465788, at *2 (E.D. Mo. 2018) (quoting M & G Polymers USA, LLC v. Tackett, 135 S.Ct. 926, 933 (2015)).

"The plaintiff bears the burden of proof in an action under ERISA to collect delinquent contributions." Greater St. Louis Constr. Laborers Welfare Fund v. Symmetry Landscaping, Inc., No. 4:09-CV-401 ERW, 2012 WL 1070097, at *10 (E.D. Mo. Mar. 29, 2012). "If an employer fails to keep adequate records, [ ] once a plaintiff shows that covered work was performed, the burden shifts to the employer to rebut a presumption that all hours were covered work." Reed, 994 F.Supp.2d at 1031. But where, as here, a dispute "arises because of assumptions the [plaintiff] [f]unds made in interpreting [an employer's] records," and the employer "come[s] forward with evidence establishing that the auditor's assumptions were unfounded," the plaintiffs must come forward with evidence to the contrary or be left "with an unremedied failure of proof." Iron Workers, 2016 WL 4701588, at *6 (quoting McKenzie Eng'g, 217 F.3d at 585).

9

Plaintiffs' claim for unpaid contributions is based entirely on the payroll audit performed by RSM.  Defendant challenges the assumption underlying RSM's examinations, specifically that Defendant owed contributions for all hours worked by its employees, regardless of whether the work was performed on a construction site.  Defendant maintains that it satisfied its obligations under the CBA because it paid contributions for hours its employees worked on construction sites, and it contends that the hours for which Plaintiffs seek delinquent contributions represent work that was not performed on construction sites.[9]

In support of its position that it was only obligated to pay contributions and supplemental dues for hours worked on construction sites, Defendant relies primarily on Section 2.01 of the CBA, which states:  "This Agreement shall apply *only* to work of the Employer *on construction sites*…." (emphasis added).  Defendant also points to Section 5.01 of the CBA, which defines two broad categories of construction work covered by the CBA (namely, "Building Construction" and "Highway/Heavy") and sets forth wage schedules and specific contribution amounts based on the types and locations of work performed.  Referring to the wage schedules in Section 5.01, the CBA provisions governing fringe benefits state that, "[i]n addition to the per hour wage rates the Employer will contribute (specific amounts will be noted on wage schedules) per hour for each actual hour worked by each employee covered by this Agreement."[10]   The references to the wage schedules are significant because the wage schedules, like Section 2.01, limit fringe benefit contributions and supplemental dues to work performed on construction sites.

---

[9] Neither party contends there is any in the CBA that requires the Court to look outside the document itself.  Therefore, the Court limits its analysis to the plain language of the CBA and does not consider extrinsic evidence.  See, e.g., Agency for Cmty. Transit, Inc., 2018 WL 465788, at *2.

[10] While Section 5.05, relating to the Vacation Fund, does not explicitly refer to the "wage schedules," it provides that "Employer will deduct one dollar ($1.00) for each hour worked from the basic wage rate and pay the same to" the Vacation Fund.

10

In support of their position that the CBA requires contributions for work performed on and off construction sites, Plaintiffs rely on Iron Workers, 2016 WL 4701588.  The CBA in Iron Workers was similar to the parties' CBA here in that it required the defendant employer to make contributions to the plaintiffs funds "for each hour worked for each employee covered by this agreement." Id. at *3.  By its terms, the CBA covered "Iron Workers and Apprentices who are employed by [Defendant] performing work described in Article 2 hereof," which, in turn, listed various types of work related to ironworking.  Id. at *4.  The Iron Workers court held that the CBA "unambiguously requires contributions for all hours worked by covered employees, regardless of the type of work performed." Id. at *8.

The CBA in Iron Workers is distinguishable from the CBA in this case because it did not contain language similar to that of Section 5.01, providing that the wage schedules and contribution requirements apply to "all employees in the unit, when employees are engaged in the general activities in conjunction with Building Construction and Highway/Heavy[.]"  Nor did the contribution provisions in the Iron Workers CBA refer back to those wage schedules and contribution requirements for work performed on construction sites.

Plaintiffs assert that, because the Revised Final Report contains "reasonable estimates based on the documentation available to [RSM]," the burden shifts to Defendant to "show that the estimate is wrong and to prove the exact amount owed." [ECF No. 33 at 2 (citing Greater St. Louis Constr. Laborers Welfare Fund v. Am. Contracting Enterprizes Inc., No. 4:11-CV-303 RWS, 2013 WL 1818027, at *3 (E.D. Mo. Apr. 29, 2013)]   However, the Eighth Circuit rejected this burden-shifting approach where "there is no issue … as to the accuracy of [the defendant employer's] records" and the defendant employer challenges "assumptions the Funds made in interpreting" payroll records.  McKenzie Eng'g, 217 F.3d at 585.  Cf. Symmetry Landscaping, Inc., 2012 WL

11

1070097, at *10 ("[W]here an employer has made the amount of damages uncertain by failing to maintain or produce adequate records, some courts have shifted the burden and required an employer to disprove the plaintiff's evidence."). Because the dispute in this case arises from the assumptions underlying the audit and not the payroll records themselves, Defendant need not conduct its own audit and/or prove the exact amount owed.[11]  See, e.g., Cent. States, Se. & Sw. Areas Pension Fund v. Transp. Serv. Co., No. 00 C 6181, 2009 WL 424145, at *10 (N.D. Ill. Feb. 17, 2009) ("If the employer produces any evidence that potentially calls the audit into question, the audit results become a question of disputed fact, and summary judgment [for the plaintiffs funds] is precluded.").

The Court finds that Defendant effectively challenged the assumption underlying the Final Examination Report and Plaintiffs' claims for delinquent contributions and supplemental dues. Relying on the plain language of the CBA, Defendant presented evidence that it was not obligated to contribute fringe benefits and supplemental dues for all hours worked regardless of where the work was performed, shifting the burden to Plaintiffs to "come forward with evidence to the contrary." Iron Workers, 2016 WL 4701588 at *6; see also McKenzie Eng'g, 217 F.3d at 585. However, Plaintiffs' reliance on the CBA language requiring contributions for "each actual hour worked" in isolation from the associated wage schedules and contributions requirements based on

---

[11] Plaintiffs appear to suggest that this burden-shifting approach applies in this case because, after RSM provided the Preliminary Examination Report, Defendant declined to provide further documentation. [See ECF No. 33 at 2-3]  The summary judgment records reflect that, when Mr. Massa requested clarification relating to Defendant's treatment of work considered not covered under the CBA, Defendant's payroll administrator referred Mr. Massa to the "time cards we provided previously." [ECF No. 29-9]  As such, this is not a case where the defendant employer failed to provide the documents necessary to verify the plaintiffs' damages. Cf. Am. Contracting Enterprizes, Inc., 2013 WL 1818027, at *3 (because the defendant refused to provide the necessary documents, plaintiffs were forced "to make reasonable estimates based upon the documentation available to them," and the burden shifted to the defendant "to show that the estimate is wrong and to prove the exact amount owed.").

work classification and geographical areas, "le[aves Plaintiffs] with an unremedied failure of proof." McKenzie Eng'g, 217 F.3d at 585.  Because there is no genuine dispute as to any material fact, and because the record on summary judgment demonstrates that Defendant is entitled to judgment as a matter of law, the Court grants Defendant's motion for summary judgment and denies Plaintiffs' motion for summary judgment.[12]

Accordingly, after careful consideration,

**IT IS HEREBY ORDERED** that Plaintiffs' motion for summary judgment [ECF No. 25] is **DENIED.**

**IT IS FURTHER ORDERED** that Defendant's cross motion for summary judgment [ECF No. 27] is **GRANTED**.

A separate judgment in accordance with this Order and Memorandum is entered this same date.

*(signature)*
PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE

Dated this 8th day of December, 2021

---

[12] Because Defendant demonstrated that there is no genuine issue as to any material fact and it is entitled to judgment as a matter of law, the Court does not consider its equitable defenses.